# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**KENNETH RUTHERFORD,**

    **Plaintiff,**

    v.

                        Civil Action 2:09-cv-914
                        Judge James L. Graham
                        Magistrate Judge E.A. Preston Deavers

**GINNY LAMNECK,** *et al.*,

    **Defendants.**

## REPORT AND RECOMMENDATION

Plaintiff, Kenneth Rutherford, an Ohio inmate who is proceeding without the assistance of counsel, brings this civil rights action under 42 U.S.C. § 1983, alleging that Defendants, employees of Correctional Reception Center ("CRC"), utilized excessive force against him in violation of the Eighth Amendment to the United States Constitution. This matter is before the Court for consideration of Defendants' Motion for Summary Judgment (ECF No. 46), Plaintiff's Memorandum in Opposition (ECF No. 47), and Defendants' Reply (ECF No. 48). For the reasons that follow, it is **RECOMMENDED** that Defendants' Motion be **GRANTED IN PART AND DENIED IN PART**.

## I. BACKGROUND

This action arises from events taking place on September 4, 2008. The parties' versions of the events are highly disputed.

### A. Plaintiff's Version[1]

According to Plaintiff, as he and other inmates were lining up for dinner, Defendant Sam Cheadle, a CRC Training/Corrections Officer, bumped into him, causing his hands, which were clasped behind his back in the "parade rest" position, to hit Cheadle's radio. Cheadle sarcastically accused him of trying to take his radio. Plaintiff responded, "What the hell [am I going to] do with your radio, push the man down." (Pl.'s Mem. in Opp. 1, ECF No. 47-1.) The inmates began to laugh, irritating Cheadle. Cheadle stated, "You still haven't learned." (*Id.*) Plaintiff ignored Cheadle and proceeded to dinner.

Later that day, after dinner, Cheadle directed Plaintiff to report to the rear of the line, next to him, to be escorted back to his cell. Cheadle began to make comments to Plaintiff, threatening to beat Plaintiff up before the night ended. Plaintiff told Cheadle to "pick his shot because [he] wasn't going to fight back." (*Id.*) Upon entering the cell unit, Cheadle directed Plaintiff and his cellmate to exit their cell and place their hands on the wall for a routine cell inspection. Cheadle then instructed Plaintiff's cellmate to return to the cell. Cheadle approached Plaintiff and told him to spread his legs. Cheadle proceeded to kick the insides of Plaintiff's ankles and calves, spreading his legs so far apart that he almost fell. Cheadle made comments

---

[1]Plaintiff sets forth these facts in his Memorandum in Opposition to Defendants' Motion for Summary Judgment. (ECF No. 47.) He declares, under penalty of perjury, that the factual summary provided in his Memorandum is true and correct. (ECF No. 47-2.) As such, his factual assertions are properly supported for purposes of Federal Rule of Civil Procedure 56(c). *See* 28 U.S.C. § 1746 (permitting written, unsworn declaration subscribed in proper form as true under penalty of perjury to substitute for an affidavit).

intended to provoke Plaintiff to fight him. When Plaintiff did not respond, Cheadle ordered Plaintiff to "go and grab some bars." (*Id*. at 2.) Plaintiff walked five feet to the bars in the stairway. Cheadle directed him to go instead to the shower bars, where visibility was limited.

As Plaintiff placed his hands on the shower bars, Cheadle grabbed Plaintiff by the back of the neck, attempting to slam Plaintiff's face on the bars. Plaintiff braced his body, preventing his head from hitting the bars. Cheadle then yelled, "Swing Mother F—er; you want to take my radio?" (*Id*.) Plaintiff did not respond. Cheadle grabbed Plaintiff around the neck and took him to the floor. Defendant Fisher, a CRC Corrections Officer, joined Cheadle. Defendant Spezzalli, another CRC Corrections Officer, also responded to the alarm and assisted in restraining Plaintiff. During this incident, Plaintiff felt kicks, punches, and a knee on the back of his neck. Cheadle punched him in his right eye. Plaintiff screamed, and one of the Defendants responded, "That['s] the sound we like to hear!" (*Id*. at 3.)

**B.    Defendants' Version**

Defendants dispute Plaintiff's version of the facts. According to Cheadle, in accordance with normal procedure, he had directed Plaintiff to place his hands on the wall during the search of his cell. While he searched Plaintiff's cell, he could hear the other inmates becoming loud. He speculated that the other inmates were encouraging Plaintiff to become rebellious or that he was agitating the other inmates. He left the cell to see what was happening. He noticed that Plaintiff had taken his hands off the wall. Cheadle ordered Plaintiff to place his hands back on the wall, but he refused. Cheadle decided to escort Plaintiff to the shower area, where the other inmates could not interact with him. Plaintiff began to use profanity and pushed or attempted to push Cheadle. Cheadle pushed back. Plaintiff returned and grabbed Cheadle's radio. Cheadle

3

pulled his "man down" cord to request assistance. (Cheadle Decl. ¶ 8, ECF No. 46-2.) In order to maintain control, Cheadle attempted to take Plaintiff to the ground. Cheadle does not remember how exactly they ended up on the floor, but he represents that he did not grab Plaintiff around the neck or throw him to the floor. Cheadle further represents that Plaintiff resisted by placing his hands under his body. When Defendant Fisher arrived, Cheadle was able to handcuff Plaintiff. Cheadle denies Plaintiff's allegations that he hit, kicked, or otherwise used excessive force. At the time of the incident, Cheadle did not notice Plaintiff was injured and is unaware of how any injuries would have occurred. Defendant Fisher represents that he observed Plaintiff resisting, that he assisted Cheadle in restraining Plaintiff, and that he did not observe anyone using excessive force in restraining Plaintiff. Defendant Spezzalli represents that when he arrived to assist, Cheadle and Fisher were on the floor attempting to restrain Plaintiff. He similarly represents that he did not observe anyone hit or kick Plaintiff.

Shannon Hill, a CRC nurse who treated Plaintiff after the incident, indicated that she did not observe injuries to Plaintiff's legs, arms, or torso. She did, however, observe swelling and bruising below Plaintiff's right eye. She opines that "[A] fractured orbital bone could have been caused by [Plaintiff's] face hitting the floor." (Hill Decl. ¶ 7, ECF No. 46-5.) Karen Oppy, an Ohio Department of Rehabilitation and Correction ("ODRC") nurse, reviewed Plaintiff's records and likewise opined that "Plaintiff's orbital fracture could result from his face striking the floor." (Oppy Decl. ¶ 9, ECF No. 46-6.) She also represents that tests conducted one week after the incident were negative for blood in Plaintiff's urine.

## C. Grievance and Investigation History

On September 17, 2008, Plaintiff filed an Informal Complaint Resolution regarding the incident. (ECF No. 46-8.) Plaintiff describes the events and complains of Cheadle's use of force. He does not mention the presence or involvement of any other officers. Under "Action Taken" on the grievance form, it was noted that the prison's Use of Force Committee was conducting an investigation. (*Id.*)

In connection with the Committee's investigation, several inmates issued statements corroborating Plaintiff's representation that he had not resisted Cheadle. Another inmate the Committee interviewed, inmate Fantill, thought that Plaintiff seemed "[a] little bit resistant" because he was screaming when they were holding him down. (Fantill Interview 2, ECF No. 47-3.) Fantill told the interviewer that he overheard Cheadle order Plaintiff to get on the bars near the shower. Fantill said that Plaintiff came off the bars, prompting Cheadle to take him to the ground. He reported that Cheadle had Plaintiff around the neck.

On October 27, 2008, the Committee issued its conclusion, finding that the force Cheadle applied to Plaintiff was "not unjustified." (ECF No. 47-4.) The Committee did, however, conclude that there were "many unanswered questions" regarding the incident and found that Cheadle exercised poor judgment. (*Id.*) The Committee elaborated as follows:

> This Committee still has no understanding of why inmate Rutherford was led to the shower area which was approximately 20-30 yards from where the incident began. . . . Officer Cheadle used poor judgment by escorting inmate Rutherford to the shower area. . . . In addition, it is unclear how the inmate obtained a black eye on his right eye and excessive swelling to his left eye area. This Committee is still unclear of how Rutherford's face sustained no injuries to his nose or lips but obtained a black eye from the fall which he and the officers landed abruptly to the floor. Based on the testimony of the staff and written reports there is no mention of how Rutherford obtained the redness and bruising on his neck. . . . It is still unclear if Cheadle did place inmate Rutherford in a headlock but according to the photographs taken on the day of the incident, inmate Rutherford had red

5

marks on the right side of his neck.

(*Id*.)

On December 11, 2008, the ODRC Warden, Virginia Lamneck, issued a written reprimand to Cheadle for using "poor judgment" in taking Plaintiff "to an area during the use of force where visibility was limited." (ECF No. 47-4.) The Warden noted that Plaintiff "was initially in an area that was visible and inmates were secured in their cells." (*Id*.)

On January 7, 2009, Plaintiff followed up his Informal Complaint Resolution with a Notification of Grievance regarding the incident. (ECF No. 46-8.) He again describes the events and complains of Cheadle's use of force, but does not mention the presence or involvement of any other officers. On January 12, 2009, the Institutional Inspector denied Plaintiff's grievance as not within the scope of procedure, explaining that the incident he referenced in his grievance "was handled in accordance [with] AR5120-9-02." (*Id*.) On February 6, 2009, Plaintiff filed his Appeal to the Chief Inspector. Once again, Plaintiff mentioned only Cheadle. (*Id*.) On March 18, 2009, the Chief Inspector rendered his Decision, affirming the Institutional Inspector's decision and explaining that the "incident was investigated by the Use of Force Committee and reviewed by the Warden and the Office of Prison in Central Office." (*Id*.) Linda Coval, ODRC Deputy Chief Inspector, represents that she has reviewed Plaintiff's grievance file and that he has never filed a grievance against Defendants Spezzalli or Fisher. (Coval Decl. ¶ 9, ECF No. 46-7.)

### D. Procedural History

Plaintiff filed this action, moving for leave to proceed *in forma pauperis* on October 1, 2009. (ECF No. 1.) The Court granted his *in forma pauperis* motion, causing Plaintiff's Complaint to be filed on October 16, 2009. (ECF Nos. 3 and 5.) In his Complaint, Plaintiff named CRC thirteen employees and brought claims under 42 U.S.C. § 1983, asserting that

Defendants' alleged medical indifference and utilization of excessive force violated his rights under the Eighth Amendment to the United States Constitution. Plaintiff also asserts state-law claims for assault and battery. Upon Defendants' Motion for Judgment on the Pleadings, the Court dismissed Plaintiff's medical indifference claim without prejudice for failure to comply with the Prison Litigation Reform Act's ("PLRA") exhaustion requirements and also Plaintiff's action against all but Defendants Cheadle, Spezzalli, and Fisher. (*See* May 28, 2010 Report & Rec., ECF No. 21.) Plaintiff names these Defendants in their individual and official capacities. Defendants filed the subject Motion for Summary Judgment on January 27, 2012, seeking judgment in their favor on the remaining excessive force claim.

## II.  SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party has the initial burden of proving that no genuine issue of material fact exists, and the court must draw all reasonable inferences in the light most favorable to the nonmoving party." *Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact" then the Court may "consider the fact undisputed for purposes of the motion").

"Once the moving party meets its initial burden, the nonmovant must 'designate specific facts showing that there is a genuine issue for trial.'" *Kimble v. Wasylyshyn*, No. 10–3110, 2011 WL 4469612, at *3 (6th Cir. Sept. 28, 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)); *see also* Fed. R. Civ. P. 56(c) (requiring a party maintaining that a fact is genuinely disputed to "cit[e] to particular parts of materials in the record"). "The nonmovant must,

7

however, do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]here must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute." *Lee v. Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 441 (6th Cir. 2011) (internal quotation marks and citations omitted). "When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate." *Stanberry*, 651 F.3d at 486 (citing *Celotex*, 477 U.S. at 322–23).

## III.  ANALYSIS

Defendants assert that they are entitled to summary judgment for a variety of reasons. Specifically, Defendants maintain that (1) Plaintiff's claims against Defendants Spezzalli and Fisher should be dismissed for failure to exhaust administrative remedies; (2) Plaintiff's state-law claims must be dismissed pursuant to Ohio Revised Code § 9.86; (3) judgment on Plaintiff's excessive force claim is appropriate because there is no credible evidence that Defendants used excessive force; and (4) they are entitled to qualified immunity. The Court considers each of Defendants' arguments in turn.

**A.     Exhaustion of Administrative Remedies—Defendants Fisher & Spezzalli**

Defendants contend that Plaintiff's claims against Defendants Fisher and Spezzalli should be dismissed because Plaintiff failed to exhaust his administrative remedies with regard to these Defendants. More specifically, Defendants assert that Plaintiff failed to exhaust with regard to these Defendants because he failed to name them in his grievances. In his Memorandum in Opposition, Plaintiff does not respond to Defendants' arguments relating to exhaustion. The Court concludes that Defendants have met their burden in establishing that

Plaintiff failed to exhaust his administrative remedies with regard to Defendants Spezzalli and Fisher.

Under 42 U.S.C. § 1997e(a), as amended by the PLRA, "a prisoner confined in any jail, prison, or other correctional facility" may not bring an action challenging "prison conditions" under 42 U.S.C. § 1983 "or any other Federal law . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." (citation omitted)). This mandatory exhaustion requirement applies to all lawsuits relating to prison conditions, regardless of the nature of the wrong or the relief sought. *Porter v. Nussle*, 534 U.S. 516, 524 (2002). "Exhaustion" under the PLRA means "proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). To properly exhaust, prisoners must "tak[e] advantage of each step the prison holds out for resolving the claim internally and . . . follow the 'critical procedural rules' of the prison's grievance process to permit prison officials to review and, if necessary, correct the grievance 'on the merits' in the first instance." *Reed-Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010); *Jones*, 549 U.S. at 217–18 (noting that proper exhaustion requires "[c]ompliance with prison grievance procedures"). Where, as here, an inmate "affirmatively endeavors to comply" with the administrative procedures, a court must "analyze[] whether those 'efforts to exhaust were sufficient under the circumstances.'" *Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011) (quoting *Napier v. Laurel Cnty.*, 636 F.3d 218, 224 (6th Cir. 2011)).

Ohio has established a procedure for resolving inmate complaints. Ohio Admin. Code § 5120–9–31. To properly exhaust a claim seeking relief "regarding any aspect of institutional life that directly and personally affects the [inmate]," an inmate at an ODRC facility must comply

9

with its three-step grievance system. *Id*. For the first step, the inmate must submit an informal complaint to the staff member or to the direct supervisor of the staff member or to the department most directly responsible over the subject matter with which the inmate is concerned. Ohio Admin. Code § 5120–9–31(K)(1). If the inmate is not satisfied with the results at the first step, he may take the second step by filing a formal grievance with the inspector of institutional services at the prison where he is confined. Ohio Admin. Code § 5120–9–31(K)(2). That inspector will investigate the matter and issue a written response to the inmate's grievance within fourteen calendar days of receipt. *Id*. If the inmate is still dissatisfied, he may pursue the third step, which is an appeal to the office of the Chief Inspector of ODRC. Ohio Admin. Code § 5120–9–31(K)(3). An inmate does not exhaust his remedies under § 5120-9-31 until he has received a decision in an appeal to the office of the Chief Inspector.

"Although 'exhaustion is not per se inadequate simply because an individual later sued was not named in the grievances,' . . . a plaintiff generally fails to exhaust administrative remedies by failing to include an official's name in a grievance if it is required by the applicable grievance procedures." *Hall v. Warren*, 443 F. App'x 99, 106 (6th Cir. 2011) (quoting *Jones*, 549 U.S. at 218). The United States Court of Appeals for the Sixth Circuit has recognized an exception to the general rule requiring adherence to the applicable grievance procedures when "prison officials decline to enforce their own procedural requirements and opt to consider otherwise-defaulted claims on the merits." *Reed–Bey*, 603 F.3d at 324.

At the time Plaintiff filed his grievance, Section 5120–9–31(K) set forth the specificity requirement as follows:

> Informal complaints and grievances must contain specific information; dates, times, places, the event giving rise to the complaint and, if applicable, *the name or names of personnel involved and the name or names of any witnesses*.

10

> Specificity of the complaint provides institutional staff the opportunity to investigate the complaint and to take corrective action to address a valid complaint. In the event an inmate does not know the identity of the personnel involved, a "John/Jane Doe" complaint may be filed. However, the complaint shall be specific as to dates, times, places, physical descriptions of any unidentified personnel and the actions of said personnel giving rise to the complaint.

Ohio Admin. Code § 5120–9–31(K) (emphasis added).[2]

Applying the foregoing authority, the undersigned concludes that Plaintiff failed to properly exhaust his administrative remedies with regard to Defendants Spezzalli and Fisher. Although the relevant policy clearly required Plaintiff to identify the individuals involved, or at least directed that he reference a John or Jane Does, he did not do so. Instead, his grievance is directed only at Cheadle and makes no reference to the participation or even the presence of any other officers. *See Sullivan v. Kasajara*, 316 F. App'x 469, 470 (6th Cir. 2009) (affirming dismissal for failure to exhaust where the plaintiff failed to comply with the Michigan agency's procedural rule requiring the naming of each person against whom the plaintiff grieved); *King v. Banks*, No. 2:10-cv-852, 2012 WL 1068103, at *4 (S.D. Ohio Mar. 29, 2012) (finding that inmate had failed to exhaust his administrative remedies because his grievances did not "mention . . . defendants specifically, nor [did they] give enough factual context [such] that [the] defendants would be on notice" of the plaintiff's claims); *Leonard v. Mohr*, No. 2:11–cv–152,

---

[2] Prior to 2008, versions of § 5120-9-31 did not require such specificity. Thus, earlier decisions rejected the assertion that an Ohio inmate needed to specifically name a defendant to exhaust his or her administrative remedies. *See*, *e.g.*, *Fisher v. Ohio Dep't. Rehab. & Corr.*, No. 1:06-cv-559, 2007 WL 4248152, at *4 (S.D. Ohio Nov. 30, 2007) (concluding that the plaintiff "was not required to specifically name [the defendants] in his grievance in order to exhaust his administrative remedies" because "[t]he three-step grievance process set forth in O.A.C. § 5120-9-31 contains no specific requirement that an inmate name a specific individual in the grievance"); *Evans v. Collins,* No. 1:06-cv-342, 2007 WL 641980, at *3 (S.D. Ohio Feb. 27, 2007) (same).

2012 WL 423771, at *5 (S.D. Ohio Feb. 9, 2012) (same). The *Reed-Bay* exception is not applicable here because the record contains no evidence that CRC prison officials considered the propriety of the conduct of Defendants Spezzalli and Fisher.

Accordingly, it is **RECOMMENDED** that Plaintiff's claims against Defendants Fisher and Spezzalli be **DISMISSED WITHOUT PREJUDICE** for failure to comply with the PLRA's exhaustion requirements.

**B.     Excessive Force Claims**

Defendants maintain that judgment in their favor on Plaintiff's excessive force claim is appropriate because "[t]here is no credible evidence that Defendants used excessive force." (Defs.' Mot. 7, ECF No. 46.) Defendants further argue that the Court should reject Plaintiff's unsupported allegations as inconsistent with the medical findings. Viewing the facts in a light most favorable to Plaintiff, the Court concludes that a genuine issue of material fact exists as to whether Cheadle utilized excessive force in violation of the Eighth Amendment.

"The Eighth Amendment prohibition on cruel and unusual punishment protects prisoners from the 'unnecessary and wanton infliction of pain.'" *Barker v. Goodrich*, 649 F.3d 428, 434 (6th Cir. 2011) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). "Whether [a defendant's] alleged conduct constitute[s] excessive force in violation of the Eighth Amendment depends on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id*. (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). Relevant factors in this analysis include "'the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *United States v. Bunke*, 412 F. App'x 760, 765 (6th Cir. 2011). A claimant need not establish a

"significant injury" to prove an excessive-force violation. *Wilkins v. Gaddy*, 130 S.Ct. 1175, 1178 (2010). The Supreme Court, however, has cautioned that the extent of the injury is still meaningful in the analysis:

> This is not to say that the "absence of serious injury" is irrelevant to the Eighth Amendment inquiry. *Id*. at 7, 112 S.Ct. 995. "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." *Ibid*. (quoting *Whitley*, 475 U.S. at 321). The extent of injury may also provide some indication of the amount of force applied. As we stated in *Hudson*, not "every malevolent touch by a prison guard gives rise to a federal cause of action." 503 U.S. at 9. "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Ibid*. (some internal quotation marks omitted). An inmate who complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid excessive force claim. *Ibid*. (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973)).

*Id*.

Here, Plaintiff has met his burden of demonstrating that genuine issues of fact exist for trial and that a reasonable jury could return a verdict in his favor. The evidence viewed in the light most favorable to Plaintiff establishes that Cheadle led Plaintiff, who was not resisting, to an area with limited visibility where he proceeded grab him around the neck, throw him to the floor, kick him, and punch him in the eye causing serious injuries. A jury faced with these facts could find that Cheadle applied force "maliciously and sadistically to cause harm."

Defendants urge the Court to reject Plaintiff's declaration of the facts as implausible. Defendants posit that Plaintiff's assertions of fact are contradicted by the objective medical evidence and Nurses Hill and Oppy's observations. Defendants specifically point to Nurse Hill's observations of Plaintiff after the incident; Plaintiff's September 11, 2008 urinalysis, which was negative for blood in his urine; and also Nurses Hill and Oppy's declaration that someone's face hitting the floor could result in an orbital fracture such as Plaintiff's. The Court concludes that

13

the medical evidence upon which Defendants rely neither proves nor disproves Plaintiff's allegations. That someone "could" sustain an orbital fracture to his face as a result of his face hitting the floor does not require a jury to find that Plaintiff's orbital fracture occurred as a result of the fall rather than as a result of Cheadle punching him in the eye as Plaintiff contends. Indeed, the Use of Force Committee concluded that "one of the many unanswered questions regarding [the] incident" was how Plaintiff's "face sustained no injuries to his nose or lips but [he] obtained a black eye from the fall . . . ." (ECF No. 47-4.) Further, although Nurse Hill noted that Plaintiff's "only observable injuries were slight edema (swelling) and a dark red area below his right eye" (Hill Decl. ¶ 5, ECF No. 46-5), the Use of Force Committee also commented that "the photographs taken on the day of the incident" showed "redness and bruising on [Plaintiff's] neck." (*Id*.) Because Cheadle denied grabbing Plaintiff around the neck, the Use of Force Committee identified the presence of these marks on Plaintiff's neck as one of the "many unanswered questions." (*Id*.) Finally, the September 11, 2008 urinalysis results do not necessarily refute Plaintiff's allegations that immediately after the incident he was coughing up and urinating blood given that the urinalysis was not conducted until a week after the incident.

In sum, the Court concludes that genuine issues of material fact require a jury to decide whether Plaintiff's Eighth Amendment rights were violated.

**C.      State-Law Assault & Battery Claims**

Defendants correctly argue that Plaintiff cannot, at this juncture, pursue his state-law assault and battery claims in this action. "A federal court exercising pendent jurisdiction sits as a court of the forum state and is bound to apply its substantive law." *Haynes v. Marshall*, 887 F.2d 700, 705 (6th Cir. 1989) (citing *Guaranty Trust Co. v. York*, 326 U.S. 99, 108–09 (1945)).

In Ohio, Section 9.86 of the Revised Code confers civil immunity to state officers and employees:

> Except for civil actions that arise out of the operation of a motor vehicle and civil actions in which the state is the plaintiff, no officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner.

Ohio Rev. Code § 9.86. Ohio Revised Code § 2743.02(F) "requires that, as a condition precedent to asserting a cause of action against a state employee in his individual capacity, the Court of Claims must first determine that the employee is not entitled to the immunity provided for in Section 9.86." *Haynes*, 887 F.2d at 705.

In this case, Plaintiff has failed to obtain a determination from the Ohio Court of Claims that Defendants are amenable to suit. Consequently, "there is no claim under Ohio law upon which relief may be granted against Defendants in their individual capacities." *Id*. at 705. Thus, this Court cannot exercise pendent jurisdiction over Plaintiff's state-law assault and battery claims. The undersigned, therefore, **RECOMMENDS DISMISSAL** of these claims for lack of jurisdiction.

D.     **Qualified Immunity**

Plaintiff brings this action against Defendants in their individual and official capacities. (Compl. ¶ 15, ECF No. 5.) "Defendants sued in their official capacities are not eligible for qualified immunity." *Barker*, 649 F.3d at 433 (citing *Kentucky v. Graham*, 473 U.S. 159, 167 (1985)). Thus, the undersigned recommends that the Court conclude that Defendants in their official capacities are not entitled to qualified immunity. The undersigned further recommends that the Court decline to grant Defendants qualified immunity with regard to Plaintiff's damages

claims against them in their individual capacities.

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "[Q]ualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id*. (internal quotation marks and citations omitted). The determination of whether a government official is entitled to qualified immunity involves two inquiries. *Miller v. Sanilac County*, 606 F.3d 240, 247 (6th Cir. 2010). "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation?" *Id*. (internal quotation marks and citations omitted). The Court need not consider these inquiries sequentially. *Jones v. Byrnes*, 585 F.3d 971, 975 (6th Cir. 2009) (citation omitted).

In this case, the Court concludes that Defendants are not entitled to qualified immunity. First, it is undisputed that the right to be free from excessive force was clearly established at the time of the alleged violation. *Kostrzewa v. City of Troy*, 247 F.3d 633, 641 (6th Cir. 2001) (citations omitted) ("This circuit has held that the right to be free from excessive force . . . is a clearly established right for purposes of the qualified immunity analysis.") Second, as set forth

16

above, the Court concludes that Plaintiff's version of the facts, if taken in a light most favorable to Plaintiff, demonstrate that Cheadle utilized excessive force in violation of the Eighth Amendment. Thus, because a jury must resolve the factual disputes before the Court can decide whether the amount of force utilized was reasonable under the circumstances, qualified immunity is not appropriate.

Defendants' arguments to the contrary are unpersuasive. Defendants maintain that they are entitled to qualified immunity because "there is no case law that exists that holds that prison officials cannot use reasonable force to control an inmate who has attempted to seize control of a correctional officer's equipment, acts aggressively towards an officer, and refuses to follow directions." (Defs.' Mot. 13, ECF No. 46.) Defendants' assertion lacks merit because it is premised upon their own disputed version of the facts. For purposes of this qualified immunity analysis, however, the Court must "view[] the facts in the light most favorable to" Plaintiff, as with any motion for summary judgment. *Miller*, 606 F.3d at 247. Where, as here, the reasonableness of the force utilized turns upon which party's version of the facts is accepted, a court should not grant summary judgment on qualified immunity grounds. *See Murray-Ruhl v. Passinault*, 246 F. App'x 338, 343 (6th Cir. 2007) (internal quotation marks and case citation omitted) ("[I]f the legal question of [qualified] immunity is completely dependant upon which view of the facts is accepted by the jury, the district court should not grant [qualified] immunity . . . ."); *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998) (citations omitted) (explaining that where "qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability").

In sum, genuine issues of material fact remain as to whether Cheadle's use of force violated Plaintiff's clearly established constitutional rights. The undersigned, therefore,
17

**RECOMMENDS** denial of qualified immunity.

## IV. RECOMMENDATIONS

For the reasons set forth above, it is **RECOMMENDED** that:

1. Plaintiff's claims against Defendants Fisher and Spezzalli be **DISMISSED WITHOUT PREJUDICE** for failure to comply with the PLRA's exhaustion requirements.

2. Plaintiff's state-law assault and battery claims be **DISMISSED** for lack of jurisdiction.

3. The remainder of Defendant's Motion be **DENIED**, such that Plaintiff may proceed on his Eighth Amendment excessive force claims against Defendant Cheadle.

## V. PROCEDURE FOR OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to

magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: May 7, 2012  /s/ *Elizabeth A. Preston Deavers*
Elizabeth A. Preston Deavers
United States Magistrate Judge